Filed 5/22/14  Taylor v. City of Burbank CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM TAYLOR, | B242502 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC422252) |
| v. | |
| CITY OF BURBANK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John L. Segal, Judge.  Affirmed.

Amelia Ann Albano, City Attorney, Carol Ann Humiston, Assistant City Attorney; Ballard, Rosenberg, Golper & Savitt, Linda M. Savitt; Burke Williams & Sorensen, Ronald F. Frank; Greines, Martin, Stein & Richland, Timothy T. Coates, Alana H. Rotter and Kent J. Bullard for Defendant and Appellant.

Law Offices of Gregory W. Smith, Gregory W. Smith; Christopher Brizzolara; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury found that defendant and appellant City of Burbank (the City) wrongfully demoted and/or fired plaintiff and respondent William Taylor, the City's former deputy chief of police. The City appeals the judgment based on alleged juror misconduct and instructional error. We find no misconduct or error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.[1]

A.      *Taylor's history of employment with the City and attempts to address alleged wrongdoing in the police department.*

Taylor began working for the Burbank Police Department in 1984. He worked his way up department ranks until, in August 2007, Burbank's Chief of Police Timothy Stehr appointed Taylor as his deputy chief. Taylor's job was to oversee the captains and police administrator in the daily operation of the department and to assist the chief.

In November 2007, Taylor gave a memorandum to Chief Stehr regarding a burglary in a police department office and two officers' alleged use of excessive force. Although Taylor wanted an outside agency to conduct an investigation, Chief Stehr reprimanded Taylor, calling him the "most mother f[uckin]g disloyal SOB" for exposing internal matters.

In March 2008, the police department received an anonymous letter about White officers abusing minority officers. An investigation concluded that there was no discrimination in the police department. Still, from April 2008 to April 2009, Taylor complained to Chief Stehr about illegal attempts to fire minority officers. Taylor intervened in several cases to prevent minority officers from being fired.

In March 2009, Taylor was informed that a lieutenant had sexually harassed a volunteer at the City's animal shelter. Against Taylor's advice, the chief allowed the

---

[1]      Where a plaintiff primarily complains of instructional error, facts on appeal are recited in the light most favorable to the claim of instructional error. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 839, fn.1; *Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.)

lieutenant to come back to work after being on administrative leave for only two weeks. The lieutenant was thereafter put back on administrative leave after people complained.

B.     *The robbery of Porto's Bakery and the internal investigation (Porto's I).*

While Taylor was deputy chief, Porto's Bakery in Burbank was robbed on December 28, 2007.[2]  In April 2008, Lieutenant Jamie Puglisi (J.J. Puglisi) told Taylor that Lieutenant Omar Rodriguez, who was a friend of Taylor's, had possibly used excessive force while interviewing a witness to the robbery.  Taylor and Chief Stehr agreed that an internal affairs investigation was necessary.  Because the allegations were made by a lieutenant against a lieutenant and there was animosity between those lieutenants, Taylor suggested that an outside agency like the Sheriffs' Department conduct the investigation.  Chief Stehr disagreed and had Puglisi, assisted by Officer Gerardo Misquez, conduct the investigation, referred to as Porto's I.[3]

Porto's I was completed in July 2008 with the finding that the allegations against Rodriguez were "not sustained," meaning misconduct may have occurred but there wasn't enough evidence to prove it.  This is opposed to a finding of "unfounded," meaning misconduct did not occur.  Taylor thought the charges should have been unfounded.

C.     *The Porto's II investigation.*

In April 2009, police officer union representatives, Michael Parrinello and Travis Irving, expressed to Chief Stehr dissatisfaction with Taylor and raised the possibility of a no-confidence vote in the chief.  They also told Chief Stehr that Detective Angelo Dahlia, who had previously denied seeing Lieutenant Rodriguez assault a witness, now claimed he did see an assault.  Although Taylor disagreed another investigation was necessary, the City hired James Milton Gardiner to reopen the investigation, called Porto's II or the

---

**2**      It was eventually determined that a Porto's employee intentionally let MS-13 gang members into the bakery.

**3**      Chief Stehr denied at trial that Taylor told him the investigation should be handled outside the department.

Gardiner Investigation, into whether Lieutenant Rodriguez assaulted a witness.[4] The investigation expanded as allegations of excessive force and interference by other police officers surfaced. Thirty-eight subinvestigations were opened, including subinvestigation No. 34 to determine whether Taylor interfered with the Porto's I investigation.

Feeling that he needed to take more control of the department, Chief Stehr, on May 4, 2009, told Taylor that he would no longer be deputy chief, although he would remain a captain.[5] The chief referred to this as a restructuring rather than a demotion, and Taylor received the same salary.[6]

On June 15, 2009, Taylor filed a complaint with the Department of Fair Employment and Housing alleging he had been demoted in retaliation for reporting discrimination. On August 3, 2009, he filed a government claim alleging he was demoted for reporting misconduct in the police department. After being informed that he was the subject of Gardiner's investigation, Taylor filed a lawsuit against Burbank for retaliation on September 22, 2009. Chief Stehr retired at the end of 2009, and the new Chief of Police Royal Scott LaChasse hired Thomas Angel in a captain position. On January 21, 2010, Taylor was put on paid administrative leave.

In March 2010, Gardiner filed his report on the Taylor subinvestigation. The report concluded that Taylor had "demonstrated a personal interest in limiting the [Porto's I] investigation and did not support the impartial prosecution of the internal affairs investigation." Taylor "seriously hindered" the Porto's I investigation and had

---

[4]     Chief Stehr also referred the matter to the Sheriff's Department and to the FBI.

[5]     According to Taylor, Burbank City Manager Michael Flad told him his career in Burbank was over.

[6]     Police Sergeant Robert Quesada, Chief Stehr's "right-hand man," testified that Stehr told him the police officer's union was threatening him with a no-confidence vote and he had to do something, so he was considering demoting Taylor.

4

"demeaned and threatened subordinate employees."[7]  Based on that report, Chief LaChasse fired Taylor on June 10, 2010.[8]

## II.     Procedural background.

After Taylor filed his lawsuit for retaliatory demotion against the City on September 22, 2009, he amended his complaint to allege a first cause of action for retaliation under Labor Code section 1102.5 and a second cause of action for retaliation in violation of California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (h)).

A jury returned a 9-to-3 general verdict for Taylor on March 19, 2012.  The jury awarded him $1,048,579 in economic damages and $250,000 in noneconomic damages. As the prevailing party in a FEHA lawsuit, Taylor was also awarded $820,610.60 in attorney fees, $22,925 in expert witness fees, and $8,939.49 in costs.

The City moved for a new trial on the grounds of juror misconduct and instructional error.  The trial court denied the motion, and this appeal followed.

## DISCUSSION

## I.     Juror misconduct.

Based on the alleged failure of two jurors to disclose their criminal backgrounds, the City contends that its motion for new trial based on juror misconduct should have been granted.  We disagree.

### A.     *Additional facts*.

#### 1.     Voir dire.

During voir dire, the trial court asked prospective jurors, "Have any of you had any contact or involvement with law enforcement that was particularly positive or negative that you think might affect your ability to be fair and impartial?"  The court then commented that Prospective Juror No. 3 had a negative experience, but "[h]ave any of you had any contact with a law enforcement organization of any kind, such as the police

---

[7]     Porto's II also sustained the finding that Rodriguez used excessive force.

[8]     Nine other officers were fired.

or security or anything like that, that was strictly positive or negative?" In response, one prospective juror complained about several negative experiences. The court then asked did "[a]nyone else have a particularly positive or a negative experience with law enforcement?" No other juror responded.[9]

### 2. Motion for new trial.

The City moved for a new trial based on, among other things, the alleged misconduct of Jurors No. 6 and 7, both of whom voted in the majority for Taylor, for failing to respond to the above voir dire questions. In support of the motion, the City requested judicial notice of certified criminal court records. Those records included a misdemeanor complaint filed in April 2003 against Juror No. 6 for carrying a concealed dirk or dagger (former Pen. Code, § 12020, subd. (a)(4)) and for unlawful assembly (Pen. Code, § 409) for which he received 24 months' summary probation. As to Juror No. 7, three misdemeanor complaints in 2009, 2010, and 2011, respectively, were filed against her, all alleging driving with a suspended or revoked license (Veh. Code, § 14601.1, subd. (a)). She also faced marijuana possession and driving without insurance charges (Health & Saf. Code, § 11357, subd. (b); Veh. Code, § 16028, subd. (a)).

Taylor objected to these records on multiple grounds, including that they lacked foundation and were hearsay.

The trial court denied the motion without ruling on the evidentiary objections or making any express findings.

### B. *The City has failed to satisfy its burden of establishing misconduct.*

" 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' " (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110.) Exploring prospective jurors'

---

[9] In response to questions about whether the prospective jurors could be fair and impartial, one juror said he'd recently had a negative experience with the police. "It was a DUI thing." Another prospective juror said he was unfairly arrested for a DUI 23 years ago. A third prospective juror said he'd had a "bad experience" when he was handcuffed for no reason.

impartiality at voir dire protects this right.  (*In re Hitchings* (1993) 6 Cal.4th 97, 110.)  "Of course, the efficacy of voir dire is dependent on prospective jurors answering truthfully when questioned.  As the United States Supreme Court has stated, '*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors.  Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.  The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.'  [Citation.]"  (*Id.* at pp. 110-111.)

A juror who conceals relevant facts during voir dire "thus undermines the jury selection process and commits misconduct."  (*In re Hitchings, supra,* 6 Cal.4th at p. 111.)  Concealment also eviscerates a party's right to exercise a peremptory challenge to remove a prospective juror the party believes cannot be impartial and fair.  (*Ibid.*; see also *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57.)  Where juror misconduct materially affects the substantial rights of a party, a verdict may be vacated, in whole or in part, on a motion for a new trial.  (Code Civ. Proc., § 657, [¶] (2).)  A party moving for a new trial on the ground of juror misconduct bears the burden of establishing misconduct occurred and that misconduct was prejudicial.  (*Ovando*, at p. 57; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.)

We independently review a trial court's denial of a new trial motion.  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872; see also *People v. Ault* (2004) 33 Cal.4th 1250, 1262 ["Courts have stressed the particular need for independent review of the trial court's reasons for *denying* a new trial motion in *juror bias* cases"].)  Also, whether misconduct is prejudicial is reviewed independently as a mixed question of law and fact when the trial court denies a motion for new trial.  (*Ault*, at pp. 1260-1263.)  "Although juror misconduct raises a presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test.  That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the

7

nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e, no *substantial likelihood* that one or more jurors were actually biased against the defendant.' [Citation.]  In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias." (*In re Boyette* (2013) 56 Cal.4th 866, 889-890.)

Here, we need not decide prejudice, because the City failed to meet its burden of establishing misconduct.  (*People v. Collins* (2010) 49 Cal.4th 175, 242 [only if misconduct is established "do we consider whether the conduct was prejudicial"].)  The evidence of misconduct consists of superior court records purporting to show that Juror Nos. 6 and 7 had criminal backgrounds.  Judicial notice may be taken of these records.[10] (Evid. Code, § 452, subd. (d) [judicial notice may be taken of the records of any court of this state].)  Taylor, however, objected to the records on the ground, among others, they were hearsay and the trial court could not take judicial notice of the truth of the facts stated in the documents.[11]  (See, e.g., *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1569 [judicial notice may not be taken of the truth of any factual assertions in the matter to be noticed].)  The records show that people having the same names as Juror Nos. 6 and 7 had criminal charges filed against them.  Although this is some evidence that Juror Nos. 6 and 7 have criminal backgrounds, we may not judicially notice that those jurors have criminal backgrounds or that the persons identified in those criminal records are Juror No. 6 and 7, the "facts" that the City seeks to establish by virtue of those records.

---

**10** The City asks us to take judicial notice on appeal of the records.  We grant the request, as we explain.

**11** Although the City discounts Taylor's objections as "boilerplate," Taylor did object to the exhibits.  The trial court did not rule on the objections.  (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [where trial court did not rule on objections filed in summary judgment motion, the objections are reviewed de novo on appeal.)

We will, however, assume that Juror Nos. 6 and 7 have the criminal histories referenced in the records. Even so, misconduct has not been established, because the jurors were not unambiguously asked to reveal their criminal backgrounds. "In ruling on a new trial motion premised on misrepresentations by a juror during voir dire, a trial court is required to determine whether the questions propounded to the juror were relevant and unambiguous." (*Wiley v. Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 189.) "[A]n honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300; see also *In re Boyette, supra,* 56 Cal.4th at p. 890.)

In *Boyette*, for example, the jury questionnaire asked prospective jurors to disclose their criminal history and that of relatives and friends and whether the juror or a relative had a problem with alcohol or drugs. Juror Ary failed to disclose information relevant to all three topics; for example, he had been convicted of felony grand theft, and he had pleaded guilty to driving under the influence. (*In re Boyette, supra,* 56 Cal.4th at pp. 872-873, 889.)[12] The referee found that Ary's omissions resulted from a sincerely held, albeit unreasonable, interpretation of the questionnaire. (*Id.* at p. 890.) Because the juror's failures to disclose were neither intentional nor deliberate, there was insufficient support for a conclusion he was biased against the defendant. (*Ibid.*)

The failure of Juror Nos. 6 and 7 to respond to the voir dire questions about contact with law enforcement similarly constitutes insufficient support for a finding of misconduct. The trial court here asked whether prospective jurors had a "particularly positive or negative" or "strictly positive or negative" contact or involvement with law enforcement. The City argues that the jurors should have interpreted the question broadly, e.g., whether they had *any* contact with law enforcement, not just positive or negative ones. Such a broad interpretation is reasonable.

---

[12] The matter came before the court on a petition for writ of habeas corpus. Because the matter turned on disputed questions of fact, the court appointed a referee to conduct an evidentiary hearing at which Juror Ary testified.

The material point, however, is that a narrow interpretation is equally reasonable. If the jurors' experiences with law enforcement were not, in their minds, "particularly positive or negative," then the failure to respond to the question was proper. (See, e.g, *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 408 [no misconduct where juror who had been a defendant in several lawsuits failed to respond to the question, " 'Are there any of you who have been involved in lawsuits for any other reason?' "], disapproved on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574, 580; *Hasson*, at p. 408 [no misconduct where juror failed to volunteer that his son died from brain damage sustained in a car accident, although prospective jurors were asked if they had " 'dealt with brain injuries' "]; cf. *Wiley v. Southern Pacific Transportation Co., supra*, 220 Cal.App.3d at p. 186 & fns. 2, 3 [juror committed misconduct by failing to respond to question whether anyone had " 'trouble with people who trespass [on] your property' " where juror had previously been sued by a trespasser on his property]; *Estate of Mesner* (1947) 77 Cal.App.2d 667, 674-678 [juror declarations established that juror concealed his biased feelings against a party].) The jurors' failure to respond to the voir dire questions therefore does not evidence an intentional attempt to conceal a criminal background; hence, there is no showing that the jurors concealed something because they were biased.

## II. The exclusion of witnesses.

Although the trial court issued an order excluding witnesses, certain defense witnesses read trial transcripts before testifying. The court therefore instructed the jury that this could be a factor in determining witness credibility. The City now contends that the court prejudicially erred in so instructing the jury. We disagree.

### A. *Additional facts.*

Before any witness testified, Taylor's counsel moved to exclude witnesses, a motion to which defense counsel said he had no objection. The trial court excluded witnesses, except for Taylor and the City's representative, Thomas Angel. During plaintiff's cross-examination of defense witness J.J. Puglisi, he admitted reviewing Taylor's, some of Chief Stehr's and some of Janice Lowers' trial testimony. Another

10

defense witness, Officer Misquez, testified that he read some of Taylor's expert witness's testimony.

Taylor moved to strike Puglisi's testimony based on the exclusion order. When the City argued that the exclusion order did not forbid Puglisi from reviewing trial testimony, that reading trial testimony was no different than counsel orally summarizing it for Puglisi, the trial court asked, "What is the difference between ordering witnesses excluded and then giving the witnesses the testimony from the daily court reporter transcripts? What is the point of excluding witnesses if he can read the testimony?"

The trial court asked the parties to brief the issue and later indicated that a jury instruction might be proper. Defense counsel agreed that would be "an appropriate punishment to fit the so-called crime," although he would not offer any such instruction.

Taylor's counsel, who withdrew his motion to strike, proposed this instruction: " 'You may consider the fact that witnesses in this case was provided with the trial testimony of other witnesses in this case in evaluating the credibility of the trial testimony of such witness.' " The defense objected to the instruction on the ground that the general CACI instruction regarding how to evaluate a witness's credibility did not include that as a factor. He then proposed that the instruction be amended to read: " 'You may consider the fact that a witness in this case either heard or was provided with the trial testimony of other witnesses in this case and in evaluating the credibility of the trial testimony of such a witness.' "

The trial court ultimately instructed the jury: "The court issued an order during this case excluding any witness other than Mr. Taylor and Mr. Angel to be called in the case from being present during the trial testimony of any other witness in this case. You may consider the fact that a witness in this case either heard or was provided with the trial testimony of other witnesses in this case in evaluating the credibility of the trial testimony of such a witness."

B.     *The trial court did not err by instructing the jury it could consider a witness's review of trial testimony in evaluating that witness's credibility.*

The trial court "may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." (Evid. Code, § 777, subd. (a).) "The purpose of the order is to prevent tailored testimony and aid in the detection of less than candid testimony." (*People v. Valdez* (1986) 177 Cal.App.3d 680, 687; see also *Geders v. United States* (1976) 425 U.S. 80, 87.) "[I]mplicit in the right of the court to exclude witnesses is the right of the court to enforce its order." (*Valdez*, at p. 691.) "[T]he violation of a witness exclusion order [citations] does not render the witness incompetent to testify, and does not furnish grounds to refuse permission to testify, at least where the party who seeks to offer the testimony was not 'at fault' in causing the witness's violation of the exclusion order. [Citations.]" (*People v. Redondo* (1988) 203 Cal.App.3d 647, 654; see also *People v. Adams* (1993) 19 Cal.App.4th 412, 436.)

Although claims of instructional error are reviewed de novo (*People v. Cole* (2004) 33 Cal.4th 1158, 1210), we do not believe that a de novo review governs this issue. Rather, the abuse of discretion standard applies. Matters related to witness exclusion "lie[] within the sound discretion of the trial judge." (*People v. Ortega* (1969) 2 Cal.App.3d 884, 894, overruled on another ground by *People v. Gainer* (1977) 19 Cal.3d 835, disapproved by *People v. Valdez* (2012) 55 Cal.4th 82; see *People v. Young* (1985) 175 Cal.App.3d 537, 542; see also Code Civ. Proc., § 128 [every court has the power to control its process].) In an analogous situation where a party violates a discovery order, the trial court has discretion to impose various sanctions. (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36 [" 'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action' "].) What occurred here was a violation of a trial court's order concerning its trial process and evidence, and therefore the court had the discretion to fashion a remedy for the violation of its order.

12

The City, however, takes a narrow view of the trial court's witness exclusion order. The court ordered, "If there are any witnesses, they can wait outside until they are called." Because the court failed to expressly state that trial witnesses could not read the daily trial transcripts, it was permissible, the City argues. The court rightly was unimpressed with this argument: "The issue is if he can't be here during the testimony of other witnesses and if he can't watch a monitor of the testimony in the hallway while the other witnesses are testifying, what is the difference than taking that monitor, printing out the testimony, and letting him read it? [¶] I mean, what's the point? I could have just had him here in the courtroom, but we had all the witnesses excluded." Defense counsel agreed that allowing witnesses to watch a live feed would be "probably not okay."

Nor was it "okay" for excluded witnesses to read daily trial transcripts. The clear spirit and intent of the trial court's witness exclusion order was to prevent trial witnesses from tailoring their testimony. (*People v. Valdez, supra,* 177 Cal.App.3d at p. 687.) Permitting witnesses to read daily trial transcripts could be viewed as a violation of that order.

The trial court therefore had the discretion to address that violation by fashioning an instruction separate from CACI No. 5003, the general instruction listing factors bearing on a witness's credibility. The instruction the court gave first states that all witnesses except party representatives were excluded. This merely restates what Evidence Code section 777 permits.[13] The second sentence then states that the jury may consider whether a witness either heard or was provided with trial testimony in evaluating that witness's trial testimony. The instruction did not single out J.J. Puglisi. It applied equally to Taylor, who was present throughout trial. The instruction therefore did not, as the City contends, compel the conclusion that defense witness Puglisi was not

---

[13]    Evidence Code section 777 provides: "(a) Subject to subdivisions (b) and (c), the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses. [¶] (b) A party to the action cannot be excluded under this section. [¶] (c) If a person other than a natural person is a party to the action, an officer or employee designated by its attorney is entitled to be present."

13

credible.  (See, e.g., *People v. Wright* (1988) 45 Cal.3d 1126, 1135-1136, fn. 6 ["When the proposed instruction focuses exclusively or primarily on the testimony of one witness, it runs afoul of a well settled corollary of the foregoing rule, i.e., that it is ' "improper for the court to single out a particular witness and to charge the jury how his evidence should be considered" ' "].)

Nor was it necessary for the instruction to state that only a *knowing* violation of the exclusion order was relevant to a witness's credibility.  The issue the instruction addressed did not depend on a knowing or unknowing violation of the order.  As we have said, the principle underlying witness exclusion orders is preventing tailored testimony. (*People v. Valdez, supra,* 177 Cal.App.3d at p. 687.)  Whether Puglisi read Taylor's testimony and prepared his responses based on his review was relevant to his credibility. Moreover, defense counsel elicited on direct examination that Puglisi did not know of the exclusion order and did not tailor his testimony based on his review of what other witness testified.  Whether his review of trial transcripts impacted his credibility was therefore fully explored during examination, and the matter was for the jury to decide.

III.    **The good cause instruction.**

Not long before the trial court was to instruct the jury, the City submitted an untimely instruction, CACI No. 2405.  The court refused to give it to the jury, and the City now contends this was prejudicial error.  We disagree.

A.    *Additional facts.*

During trial, the trial court held several lengthy discussions with the parties concerning jury instructions.  But on March 15, 2012, just before closing arguments were to begin, the defense submitted a new instruction modeled after CACI No. 2405.  The trial court asked why it was given a new instruction 10 or 15 minutes before it was going to instruct the jury.  Defense counsel explained it had not been included in the packet due to an "oversight" discovered the night before.  Plaintiff's counsel objected to the instruction on substantive grounds and that it was untimely.  The court said: "So the reviewing [c]ourt knows, the jury instructions continue to come in three or four a day. Some of them is because we have discussions and revise some.  [¶]  The whole idea was

14

to have this done, for what could be done, five court days prior to the final status conference so we wouldn't be doing exactly this.  [¶]  So the reviewing [c]ourt knows, I have done my best to keep up with the instructions.  I don't mind going over instructions that we have talked about and revised.  [¶]  Like yesterday we talked about 3903, Workers' Compensation, but to kind of have a new instruction makes it all that more difficult.  [¶]  So I will take a look at it."

The next day, the trial court sustained the objection to CACI No. 2405 and refused to instruct the jury on it.  When defense counsel later asked the court to state its reasons for refusing the instruction, the court said it was late and therefore the court did not have the time to research it as it had done with the other instructions:  "So the reviewing court knows, and I'm not doing this to win an award, I'm just saying what I did, I spent a lot of time reading cases I have not read before including the new ones, the long one, the jury instructions, maybe 20 or 25 of them over the weekend. [¶]  And I think that everyone kind of knew I was doing that.  I said so.  So I didn't really have a chance or an opportunity to do that with the last instruction.  That is number 1.  [¶]  Number 2, I thought that as phrased, as applied to this case, it was argumentative.  It seemed to track the CACI instruction, but I thought it was a little strong because I know you had a case which I didn't get a chance to read that says that instruction also applies in retaliation cases.  But I couldn't match it up to see if the wording changed."  The court could not recall its third reason for denying the request for the instruction.

B.      *The trial court did not err by refusing to instruct the jury with CACI No. 2405.*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 572; see also *Ayala v. Arroyo Vista Family Health Center, supra,* 160 Cal.App.4th at p. 1358; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684.)  But a court may refuse a proposed instruction that incorrectly states the law, is argumentative, misleading or incomprehensible to the average juror, or is adequately covered by other instructions.  (*Bullock,* at p. 685.)  A trial

15

court also need not give an instruction if it is not supported by the pleadings and evidence in the case. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875; *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1094-1095.) The refusal of a proper instruction is prejudicial only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule*, at p 580; *Bullock*, at p. 685.) A reviewing court reviews the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. (*Ayala*, at p. 1358.)

We need not reach the issue of prejudice, because the trial court did not err by refusing to give the City's proposed instruction. Taylor's causes of action were brought under FEHA and under Labor Code section 1102.5, based on the premise he was demoted and fired for reporting discrimination and other unlawful conduct in the police department.[14] The City countered that Taylor was legitimately fired for obstructing the investigation into Porto's I.

Under FEHA, it is an unlawful employment practice for an "employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h); see also *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 712.) The ultimate issue when discriminatory discharge is alleged is what were the employer's true reasons for terminating the employee. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 358 ["While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*"]; *Mamou*, at p. 715 ["The central issue is and

---

[14] On appeal, the City concedes that its proposed instruction did not apply to the Labor Code cause of action. That concession was not made in the trial court, thereby providing an additional reason to uphold the trial court's refusal to give the instruction.

should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus"].)

Purportedly to "convey[] the message that what matters is not the wisdom or correctness of the employer's stated reason for the termination, but whether the termination was retaliatory," the City proposed this good cause instruction, modeled after CACI No. 2405:[15]

"William Taylor claims that City of Burbank did not have good cause to discharge or demote him for misconduct. City of Burbank had good cause to discharge or demote William Taylor for misconduct if City of Burbank, acting in good faith, conducted an appropriate investigation giving him [*sic*] reasonable grounds to believe that William Taylor engaged in misconduct. [¶] An appropriate investigation is one that is reasonable under the circumstances and includes notice to the employee of the claimed misconduct and an opportunity for the employee to answer the charge of misconduct before the decision to discharge or demote is made. You may find that City of Burbank had good cause to discharge or demote William Taylor without deciding if William Taylor actually engaged in misconduct."

A legitimate, nondiscriminatory or good cause reason for firing an employee may counter evidence the firing was for a discriminatory reason. (*Mamou v. Trendwest Resorts, Inc., supra,* 165 Cal.App.4th at p. 715.) Thus, it is proper to instruct a jury, in a retaliation case, that an error in business judgment, unaccompanied by a discriminatory motive, will not give rise to liability. In, for example, *Veronese v. Lucasfilm, Ltd.* (2012) 212 Cal.App.4th 1, a pregnancy discrimination case, it was error for the trial court to refuse this proposed instruction: " 'You may not find that Lucasfilm discriminated or retaliated against [plaintiff] based upon a belief that Lucasfilm made a wrong or unfair decision. Likewise, you cannot find liability for discrimination or retaliation if you find that Lucasfilm made an error in business judgment. Instead, Lucasfilm can only be liable

---

[15] CACI No. 2405 is titled "Breach of Implied Employment Contract-Unspecified Term—'Good Cause' Defined—Misconduct."

to [plaintiff] if the decisions made were motivated by discrimination or retaliation related to her being pregnant.' " (*Id*. at p. 20.) The trial court should have given the instruction because a plaintiff in a discrimination case "must show discrimination, not just that the employer's decision was wrong, mistaken, or unwise." (*Id.* at p. 21.)

Had the City timely requested a similar "business judgment" instruction, then it might have been error to refuse to give it. But the City's proposed CACI No. 2405 was not like the instruction in *Veronese*. The *Veronese* instruction properly stated that an error in business judgment or even a wrong decision does not give rise to liability for discrimination or retaliation. Liability could only be premised on decisions motivated by discrimination or retaliation related to the plaintiff's pregnancy. But the City's proposed CACI No. 2405 implied, wrongly, that the City could demote or fire Taylor simply if it had good cause to do so. Whether an employer had good, or even bad, cause to fire an employee does not necessarily answer the ultimate issue whether the *motivating* reason for the termination was a discriminatory one.[16] (*Guz v. Bechtel, National, Inc., supra*, 24 Cal.4th at p. 358.)

Nor does the City's proposed instruction address retaliatory intent. The instruction states that the City had good cause to demote or to fire Taylor for misconduct if it, " 'acting in good faith, conducted an appropriate investigation giving [it] reasonable grounds to believe that [Taylor] engaged in misconduct.' " Although the instruction refers to "good faith," this is insufficient to inform the jury that this refers to a lack of

---

[16]   The jury was instructed that Taylor, to prevail on his FEHA claim, had to prove, among other things, that his "complaint about racial discrimination or initiating an investigation into sexual harassment and/or his filing a written claim or lawsuit for FEHA retaliation was a motivating reason for City of Burbank's decision to demote and/or terminate Bill Taylor."

   The instructions further defined a " 'motivating reason' " as one that "contributed to the decision to take certain action, even though other reasons also may have contributed to the decision." (CACI No. 2507.) After the verdict in this case, the California Supreme Court decided *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, which held that the motivating reason must be "substantial."

discriminatory or retaliatory intent. The investigation could have been conducted in good faith, yet, the demotion and the termination may still have been retaliatory.

The City's additional argument that the instruction could have been modified in the trial court had Taylor raised the issue only underscores the importance of timely submitting proposed instructions. The court received the proposed instruction at the end of trial testimony. Had it been timely submitted, the court and Taylor could have adequately researched and addressed it. (See, e.g, *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1164 [untimeliness of a proposed instruction is grounds, in the trial court's discretion, to refuse it].) Therefore, not only did the trial court properly refuse to instruct the jury with CACI No. 2405 on substantive grounds but the request was also untimely.

## DISPOSITION

The judgment is affirmed.  Plaintiff and respondent William Taylor shall recover his costs on appeal.  The request for judicial notice is granted as detailed in the opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

20